CORRIGAN, J.,
Concurring and Dissenting.—I agree with most of the majority opinion’s holdings. Specifically, I agree that mitigation measures described in the environmental impact report (EIR) for the unarmored threespine stickleback would constitute a taking prohibited by the Fish and Game Code. I also agree that the methodology used to assess the significance of greenhouse gas emissions was consistent with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). The Department of Fish and Wildlife (DFW) did not violate CEQA by using the statewide emissions reduction goal in Assembly Bill No. 32 (2005-2006 Reg. Sess.) (Assembly Bill 32)[1] as a significance criterion or by comparing Newhall Ranch’s projected emissions to a business-as-usual model instead of to a baseline of existing emissions. (See maj. opn., ante, at pp. 224, 225.) Having determined the methodology was permissible, however, the majority finds insufficient evidence supporting DFW’s application of it. Here our views diverge. Because the level of detail the majority demands from this EIR is contrary to both our deferential standard of review and our approval of the methodology used to assess greenhouse gas significance, I respectfully dissent from that portion of its opinion.
A. Correlation with Statewide Goal
All members of the court agree the developers could use consistency with Assembly Bill 32 as a threshold for determining the significance of greenhouse gas emissions under CEQA. Assembly Bill 32 set a goal of reducing statewide emissions 29 percent from business as usual. Under the methodology we approve today, if expected emissions from the project are “consistent” with this statewide goal, they are not significant for purposes of CEQA. Experts project that Newhall Ranch will achieve a 31 percent reduction from business as usual, two percentage points better than Assembly Bill 32’s goal. Nevertheless, the majority concludes this projection is insufficient to support a finding of consistency with Assembly Bill 32 because the EIR does not explain how project-level reductions correlate with statewide reductions.
The majority’s analysis implicitly assumes project-level reductions in greenhouse gas emissions must be greater than the reductions California is *242 seeking to achieve statewide. It reasons that, because new developments can incorporate the most advanced technology, they may presumably achieve greater efficiency than is possible through retrofitting existing buildings. Thus, considering all greenhouse gas sources across the state, regulators may expect greater emissions reductions from new developments. (See maj. opn., ante, at p. 226.) This argument may be reasonable in the abstract, but in my view it is too amorphous a ground for invalidating a carefully prepared and thorough EIR. Although lead agencies must consider whether a project’s impacts are “cumulatively considerable” in light of existing and future projects (Pub. Resources Code, § 21083, subd. (b)(2)), no CEQA provision places the responsibility on developers to mitigate environmental impacts caused entirely by other projects. Moreover, the majority does not identify just how much better than the statewide goal new projects must be. The “Scoping Plan” for Assembly Bill 32 did not suggest, let alone mandate, specific efficiency levels for new development projects. Nor does the majority opinion indicate what specific level of reduction would be sufficient for Newhall Ranch to demonstrate consistency with Assembly Bill 32. It is not clear why a 31 percent reduction, to be achieved by the one of the largest development projects in the state’s history, is necessarily inadequate.
The majority’s substantial evidence conclusion would also seem to render our approval of DFW’s methodology illusory. Although the majority nominally approves of determining CEQA significance by measuring a project’s improvements from business as usual against Assembly Bill 32’s statewide goal, it faults the EIR here for failing to demonstrate “a quantitative equivalence between the Scoping Plan’s statewide comparison and the EIR’s own project-level comparison.” (Maj. opn., ante, at p. 227.) But we have no assurance it is even possible to calculate how a statewide goal corresponds to specific, quantitative efficiency measures for individual projects. The majority opinion discusses several approaches for assessing the significance of greenhouse gas emissions. However, only one option addresses the methodology actually used by DFW and approved in this case. DFW assessed significance by comparing the project’s reduction of emissions from business as usual to Assembly Bill 32’s goal for such reductions statewide. According to the majority, the only way it “may be possible” to obtain a quantitative correlation between these business-as-usual models is if “an examination of the data behind the Scoping Plan’s business-as-usual model” allowed the lead agency “to determine what level of reduction from business as usual a new land use development at the proposed location must contribute in order to comply with statewide goals.” (Maj. opn., ante, at p. 229.) The speculation that underlying data might yield a satisfactory answer gives little practical aid to the agencies that will have to implement our decision on remand.
As Justice Chin observes, many experts from many different agencies have scrutinized this project. (Dis. opn. of Chin, J., post, at p. 247.) Despite *243 their efforts, there is no scientific consensus as to how large a reduction at the project level is needed to establish consistency with Assembly Bill 32’ s statewide goal. Under these circumstances, the lead agency had discretion to conclude that a project-level reduction exceeding the statewide goal by two percentage points was consistent with Assembly Bill 32 and demonstrated that greenhouse gas emissions would not be significant for purposes of CEQA. (See Save Our Peninsula Committee v. Monterey County Bd. of Supervisors (2001) 87 Cal.App.4th 99, 120 [104 Cal.Rptr.2d 326].)
The majority’s contrary conclusion is inconsistent with our deferential standard of review. Under substantial evidence review, “ ‘the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.’ ” (Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278], italics added.) Our “task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.” (Ibid.) Here, the lead agency determined the greenhouse gas emissions from Newhall Ranch would not be significant for purposes of CEQA based on a methodology this court now validates. On substantial evidence review, the burden was on parties attacking the EIR to show that this determination was insupportable. Specifically, they had to demonstrate that, despite being slightly better than Assembly Bill 32’s statewide goal, the project’s 31 percent reduction in greenhouse gas emissions is too low to be “consistent” with Assembly Bill 32. They have not done so.
B. Population Density Comparison
The majority opinion’s second reason for rejecting the EIR’s conclusion about the significance of greenhouse gas emissions is both hypertechnical and insufficiently deferential to the lead agency’s expertise.
The EIR’s business-as-usual model assumes a population density equal to that currently existing at “full build out” in Santa Clarita Valley, where the project is located. Because the project is designed to have a higher density than this existing development, it is expected to significantly reduce greenhouse gas emissions from business as usual. The majority opinion criticizes the EIR for failing to correlate this comparison with the business-as-usual comparison used in the Scoping Plan. It notes that, “[t]o the extent” the Scoping Plan’s business-as-usual model is based on areas with higher population densities than Santa Clarita Valley, the EIR’s comparison of emissions reductions from those demanded in the Scoping Plan would be misleading. (Maj. opn., ante, at p. 227.)
*244 It is not immediately obvious that there is anything wrong with comparing the Newhall Ranch project with development in the surrounding area. The majority’s criticism rests on assumptions about the Scoping Plan’s business-as-usual model, but technical details about that model are not in the record. Although the majority opinion views this shortcoming as a lack of substantial evidence, I am not convinced CEQA imposed a burden on the developer or lead agency to research and document a one-to-one correspondence with all details of the Scoping Plan’s model. Again, the level of evidentiary support the majority demands is inconsistent with our deferential standard of review.
C. Conclusion
I share Justice Chin’s concerns about delay and the possibility that CEQA compliance will become a moving target, impossible to satisfy. Here, the majority nominally approves DFW’s solution to a novel and difficult problem: how to measure the significance of a project’s greenhouse gas emissions. Yet, after approving the methodology for assessing significance, the majority undermines this outcome by challenging technical details that are inherent in that methodology. Having approved of DFW’s methodology, I would defer to its conclusion that the Newhall Ranch project’s emissions will fall below CEQA’s threshold of significance.

 Statutes 2006, chapter 488, page 3419.