Filed 2/22/23  Johnson v. City of Lynwood CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| A.G. JOHNSON,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF LYNWOOD et al.,<br><br>    Defendants and Respondents. | B305060<br><br>(Los Angeles County Super. Ct. No. BS175033) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary Strobel, Judge.  Affirmed.

Corin L. Kahn for Plaintiff and Appellant.

Kane, Ballmer & Berkman, Royce K. Jones, Bruce Gridley for Defendant and Respondent City of Lynwood and City Council of the City of Lynwood.

Meylan Davitt Jain Arevian & Kim, Raymond B. Kim, Grace C. Lee for Defendant and Respondent 3000 E. Imperial, LLC.

Appellant A.G. Johnson filed a writ petition and complaint for declaratory relief challenging respondent City of Lynwood's approval of respondent 3000 East Imperial, LLC's proposed high-density, mixed use project, the Plaza Mexico Residences (PMR or the project).  Appellant also asked the trial court to set aside the City's approval of a supplemental environmental impact report (SEIR) concerning the project and related amendments to one of the City's specific land use plans.  After briefing and a hearing, the trial court denied the petition and declaratory relief.

In this appeal, appellant contends the City impermissibly failed to require the project to comply with requirements in the specific land use plan relating to open space and mobility infrastructure.  She further contends the City violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] because it did not require the project to comply with traffic mitigation requirements and failed to consider the potential environmental impacts of density transfer, greenhouse gas (GHG) emissions, and waiver of mobility infrastructure requirements.  Appellant also challenges the analytical framework the City used to evaluate GHG emissions and land use impacts.  We affirm the judgment of the trial court.

---

[1]     All further statutory references are to the Public Resources Code unless otherwise indicated.  Where applicable, the Guidelines for Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, §§ 15000-15387) will be noted as "Guidelines" to distinguish between the Public Resources Code and the Code of Regulations.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Lynwood Transit Area Specific Plan**

In September 2016, the City adopted the Lynwood Transit Area Specific Plan (LTASP), a specific land use plan for an irregularly shaped, approximately 315-acre area "surrounding the I-105 at the freeway's junction with Long Beach Boulevard and the Long Beach Boulevard Metro Green Line station."  The stated purpose of the LTASP is to "encourage the revitalization of the existing uses in the planning area and to establish a land use framework that emphasizes a compact, urban form that relies less heavily on the private automobile."  The LTASP states it is "consistent with" other local and state plans and policies, including "the City of Lynwood General Plan (2002), the Long Beach Boulevard Specific Plan (2006), and the *California Sustainable Communities and Climate Protection Act of 2008* (SB 375) 'Transit Priority Project Requirements.'"

The Metro Green Line station is the "focal point" of the LTASP, and the area is also served by six bus lines with "varying degrees of service, with headways [intervals between buses] ranging from 6-7 minutes to 60 minutes."  The "planning boundary" of the LTASP "generally contains properties within a half mile [*sic*] radius of the station," including the Plaza Mexico Shopping Center and St. Francis Medical Center, as well as portions of Long Beach Boulevard, Imperial Highway, and Martin Luther King Jr. Boulevard.  At the heart of the LTASP is the "Town Center District," a 36-acre area "bounded by Imperial Highway, Long Beach Boulevard, State Street, and the I-105."  The Town Center District is "envisioned as a destination, mixed-use, transit-oriented environment located in the center of the [LTASP] area."  It is slated for future development including "up

3

to 2,500 multi-family residential units, approximately 1.0 million square feet of local shopping, dining, and entertainment opportunities, and a 350-room hotel, all of which would create a highly livable community with transit services located within a comfortable walking or bicycling distance."  The project at issue in this appeal lies within the Town Center District.

The LTASP includes strategies and recommendations to improve pedestrian and bicycle mobility throughout the area.  It identifies Imperial Highway as one of the "backbone[s] of the pedestrian system," and recommends that "enhanced sidewalks . . . with a dedicated four-foot wide amenity zone and 6 ft. wide pedestrian zone" be established along the route.  It adds that the sidewalks "will be improved as new development occurs."  To achieve the recommended wider sidewalks, the LTASP recommends reducing the size of vehicle travel lanes, a strategy known as a "road diet."  It further recommends constructing buffered bicycle lanes on both sides of the street.  Illustrations of the envisioned changes depict them within what appears to be the public right-of-way.  The chapter titled "Implementation + Financing" also states that the City "will need to undertake a series of specific policy and regulatory actions to fully implement the LTASP," including "[i]mplement[ing] roadway restriping, road diet, transit station improvements, sidewalk improvements, bike improvements . . . and improved landscaping along the portions of . . . Imperial Highway within the LTASP."

The LTASP designates the portion of Imperial Highway bordering the northern boundary of the Town Center District as "open space."  The LTASP explains that the "intent of the Open Space land use designation is to promote the creation of inviting, safe, and accessible open spaces.  The open spaces shall include,

but are not limited to pedestrian and bicycle pathways, linear parks, and neighborhood parks."

The LTASP recommends implementation of a "Transportation Demand Management" (TDM) program to increase transit ridership and the use of non-automobile transportation. TDM "components . . . should be implemented as part of each new development in the LTASP." These include providing residents with transit information, distributing subsidized transit passes, and arranging carpools. The LTASP states that "[i]ndividual developers within the LTASP will be responsible for implementation of the program prior to the issuance of building permits, or upon verification by the City that sufficient transit demand exists," but envisions the eventual creation of a "Transportation Management Agency" to manage and fund the TDM program.

In addition to these strategic visions, the LTASP also prescribes design standards for buildings constructed in the Town Center District. These standards include maximum building heights and lengths, minimum street setbacks, minimum dwelling unit size, and minimum open space required per dwelling unit.

## II. Environmental Impact Report and Mitigation Measures

The City evaluated the potential environmental impacts of the LTASP in a draft environmental impact report (EIR), and ultimately certified a final EIR for the LTASP in 2016. Pursuant to section 21801.6, the EIR included a "Mitigation Monitoring and Reporting Program" aimed at mitigating potentially significant environmental effects it had identified. Relevant here are two mitigation measures relating to "Transportation and

Circulation," MMT-1(e) and MMT-1(f). The EIR provides that both "shall be incorporated into any future development project proposed in the Plan Area to the greatest extent feasible."

MMT-1(e) is titled "Bicycle Facilities and Other Non-motorized Transportation." It provides that future development projects in the LTASP "shall be required to construct or contribute funds toward" specified "major pedestrian/bicycle improvements." The listed improvements include: "Construct Class II Buffered/Protected Bike Lanes along Imperial Highway east from its intersection with Fernwood Avenue to Long Beach Boulevard and along State Street"; "Establish enhanced sidewalks along Imperial Highway, State Street, and Beechwood Avenue with a dedicated 4-foot wide amenity zone and a 6ft. [*sic*] wide pedestrian zone"; "Add high visibility cross-walks" to three Imperial Highway intersections; and "Add sidewalk bulb-outs and extensions, or reducing curb returns on intersection corners wherever feasible." The "Action Required" box states that project applicants "shall work with City Staff to design and construct bicycle and pedestrian improvements as part of each individual development proposal." The City's Planning and Building and Public Works Departments are identified as the "Responsible Agency or Party."

MMT-1(f) is titled "Transportation Demand Management" and concerns the TDM program. Like the LTASP itself, it provides that "[i]ndividual developers in the LTASP will be responsible for implementation of the program prior to issuance of building permits, or upon verification by the City that sufficient transit demand exists." The "Action Required" and "Responsible Party" are identical to those in MMT-1(e).

### III. Project Application and Proposed LTASP Amendments

In 2017, respondent 3000 East Imperial, LLC (developer) applied to develop a vacant 3.6-acre lot within the Town Center District. One long side of the rectangular site fronts 3000 East Imperial Highway, while one short side runs along State Street. The site is one block west of the Plaza Mexico Shopping Center, across State Street, and slightly more than 0.5 miles northwest of the Metro Green Line station.

Developer described the proposed project, the PMR, as a six-story, 675-foot-long mixed-use development that would contain 348 residential units atop 26,417 square feet of commercial space and a two-level parking structure. The residential units ranged in size from 558-square-foot studios to 1,248-square-foot three-bedrooms. The proposed height of the project exceeded the maximum prescribed by the LTASP, and some of the proposed units were smaller than the minimum prescribed by the LTASP. The proposed open space allotment of 200 square feet per unit was also below the 300-square-foot minimum. Developer applied for variances from these requirements, which the City approved along with the project.[2] Appellant, the co-owner of a nearby fourplex, challenged the approvals, however, and developer withdrew the application.

Developer submitted a revised application in 2018; this is the application currently at issue. The substance of the project itself was unchanged from the original application. However, instead of requesting variances from the LTASP requirements,

---

[2] The City conducted an initial study of the project pursuant to CEQA, after which it prepared a mitigated negative declaration.

7

developer sought to amend the LTASP such that the project would comply with its requirements.  As relevant here, the proposed amendments increased the maximum building height from five to seven stories; increased the maximum building length from 200 to 250 feet or more with City approval; reduced the front setback requirements from "0 to 5 feet min." to "0 feet"; reduced the minimum dwelling unit size from 750 square feet to 450 square feet; and reduced the minimum open space per dwelling unit from 300 square feet to 120 square feet.

The City also proposed numerous other revisions to the LTASP, most of which it characterized as "minor in nature and mainly for editorial purposes," such as correcting grammatical errors and providing "consistency of terminology throughout the Specific Plan."  More substantive edits relevant here include the addition of new text allowing "land owners within the Town Center District to transfer development potential from one property owned to another, while staying within the overall development cap established for the Town Center District."  The number of allowable dwelling units and density were included in the transferrable "development potential."  All proposed changes to the LTASP were highlighted in red typeface.

## IV.    SEIR

The City prepared a draft supplemental environmental impact report (SEIR) to assess the potential environmental impacts of the project and the proposed LTASP amendments. The SEIR was "tier[ed] off of the programmatic analysis" contained in the EIR prepared and approved in connection with the LTASP and addressed the potential for new or intensified environmental impacts associated with the project and proposed LTASP amendments.

8

The SEIR concluded that the LTASP amendments would not create any new environmental impacts or intensify those previously addressed in the EIR, because they did not change the LTASP's overall uses and intensities. It concluded that the only new or more severe potential significant impacts stemming from the PMR related to traffic, particularly around the intersections of Imperial Highway and State Street, Imperial Highway and Long Beach Boulevard, and State Street and Beechwood Boulevard. It determined that these potential impacts would be reduced to less than significant with the application of new mitigation measure MMT-2, which required developer to add right turn lanes via restriping to the intersections of Imperial Highway with Long Beach Boulevard and State Street, and convert the intersection of State Street and Beechwood Avenue from a two-way stop to a four-way stop.

The SEIR also identified MMT-1 from the EIR as an applicable mitigation measure. However, it modified the measure by striking text stating that "Mitigation Measures T-1(a) through T-1(f) shall be incorporated into any future development project proposed in the Plan Area to the greatest extent feasible" and replacing it with underlined text stating, "Prior to approval of future development projects in the Plan Area, the City shall review Mitigation Measures T-1(a) through T-1(f) to determine if a project will have significant impacts that warrant the project being subject to conditions of approval that help implement any applicable measure. If the City makes such determination it may impose conditions of approval for the project that address that project's actual impact."

During the 45-day public comment period on the draft SEIR, appellant, through counsel, submitted four letters

9

challenging various aspects of the project, the proposed amendments to the LTASP, and the SEIR. The City responded to appellant's comments in the final SEIR. The comments and responses relevant to this appeal are discussed below. We note here only that none of appellant's letters mentioned the revisions to mitigation measure MMT-1.

The City's Planning Commission held a public hearing in August 2018 and recommended approving the site plan review for the PMR, the LTASP amendments, and the SEIR.[3] Appellant, through counsel, submitted a fifth letter opposing the PMR, LTASP amendments, and SEIR later in August, on the same day the City Council held a public hearing on the matter. After the public hearing, the City Council approved the site plan review for the PMR and the LTASP amendments, and certified the SEIR.

## V. Trial Court Proceedings

On September 20, 2018, appellant filed a verified petition for writ of mandate and complaint for declaratory relief in the trial court. Developer filed its verified answer on January 25, 2019; it asserted numerous affirmative defenses, including failure to exhaust administrative remedies. Appellant filed the operative verified first amended petition and complaint on March 7, 2019; the parties stipulated that developer's previously filed answer would apply to the new filing. Appellant requested that the court issue a writ directing respondents to set aside the City Council resolution approving the site plan for the PMR and LTASP amendments and certifying the SEIR. The City answered

---

[3] Appellant was one of approximately 12 City residents who publicly voiced opposition to the project at the hearing. Approximately eight hearing attendees publicly voiced their support of the project.

10

the first amended petition and complaint on June 4, 2019.  It also asserted the affirmative defense of failure to exhaust.

The parties subsequently filed briefs and lodged the administrative record and a joint appendix with the trial court.

The trial court heard the matter on October 10, 2019.  On December 12, 2019, the court issued a 22-page written order denying appellant's petition for writ of mandamus and declaratory relief.  The court entered judgment in favor of respondents on January 17, 2020.

Appellant timely appealed.

## DISCUSSION

### I.    CEQA Principles and Standard of Review

"The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*); see also *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511 (*Sierra Club*); Guidelines § 15003, subd. (f).)  "With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or carry out a project that may have a significant effect on the environment." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 390.)  The EIR is an "informational document," the purpose of which is to provide the public with detailed information about the likely effects a proposed project is likely to have on the environment, list ways in which significant effects may be minimized, and indicate alternatives to the project.  (*Id.* at p. 391; see also § 21061.)  Before approving a project, the lead agency must certify that the EIR has been completed in compliance with

11

CEQA, that the agency has reviewed and considered the EIR, and that the EIR reflects the agency's independent judgment and analysis. (Guidelines § 15090, subd. (a).) The EIR accordingly is a "document of accountability": "[i]f CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)

A lead agency may require an SEIR under limited circumstances. (§ 21166; Guidelines § 15162.) The purpose of an SEIR is to explore potential environmental impacts not considered in the original EIR. It is not an occasion to revisit the original analysis; only changed circumstances are at issue. (*Friends of College of San Mateo Gardens v. San Mateo County Community College District* (2016) 1 Cal.5th 937, 949.) The propriety of an SEIR and the form of the document are not at issue. It is likewise undisputed that "the appropriate judicial approach is to look to the substance of the EIR, not its nominal title." (*City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 540.)

Any action or proceeding "to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with" CEQA is reviewed only to determine "whether there was a prejudicial abuse of discretion." (§ 21168.5.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*; see also § 21005; *Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova* (2007) 40 Cal.4th

12

412, 435 (*Vineyard*); *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 511.)

"Judicial review of these two types of errors differs significantly:  while we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforce[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's factual conclusions.  In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)  We accordingly "adjust [our] scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Ibid*.)  "[T]o the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted." (*Sierra Club, supra*, 6 Cal.5th at p. 516.)

"Whether an EIR has omitted essential information is a procedural question subject to de novo review." (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935; see also *Sierra Club, supra*, 6 Cal.5th at p. 514 ["whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question"].)  However, we look not for an exhaustive analysis or technical perfection; we examine the agency's review for adequacy, completeness, and a good-faith

13

effort at full disclosure. (*Sierra Club*, *supra*, 6 Cal.5th at p. 515.) The "ultimate inquiry" is whether the EIR includes sufficient detail "'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'" (*Id.* at p. 516, quoting *Laurel Heights*, *supra*, 47 Cal.3d at p. 405.) This is a mixed question of law and fact generally subject to de novo review, though "underlying factual determinations [such as] an agency's decision as to which methodologies to employ for analyzing an environmental effect [ ] may warrant deference." (*Ibid.*)

In affording that deference, we do not "'pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.] [¶] This standard of review is consistent with the requirement that the agency's approval of an EIR 'shall be supported by substantial evidence in the record.' [Citation.] In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.] The Guidelines define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.]" (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 392-393.)

Our review "is the same as the trial court's: the appellate court reviews the agency's action, not the trial court's decision; in that sense, appellate judicial review under CEQA is de novo." (*Vineyard*, *supra*, 40 Cal.4th at p. 427.) "We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [City] and whether it contains substantial evidence to

14

support the [City's] factual determinations." (*Ibid*.) In doing so, we presume the SEIR is legally adequate, and that the City correctly certified it. (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 327.) Appellant bears the burden of showing otherwise. (*Id.* at pp. 327-328.) We are not required to search the record to determine whether it supports appellant's contentions, nor must we furnish legal argument where it may be lacking. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.)

## II. Project Compliance with LTASP

Appellant contends the City failed to require the PMR to comply with the LTASP. She asserts that the "approval of zero front yard set-back along Imperial [Highway] allowed construction of a building in the exact physical location where the LTASP required land uses limited by the Open Space Land Use designation." She further asserts that the "enlarged building footprint" also will encroach upon "the exact location where the LTASP envisioned lively and stimulating pedestrian infrastructure improved by a dedicated four-foot-wide amenity zone," and the City therefore failed to require improvement of the sidewalk as development occurs. She also asserts the City failed to require developer to "contribute anything to advance bicycle, pedestrian, or other non-auto mobility," and "did nothing to reduce transportation[-]caused GHG emissions."

In reviewing the project's consistency with the LTASP, "we accord great deference to the agency's determination." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510.) "[G]eneral and specific plans attempt to balance a range of competing interests. It follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and

15

every policy set forth in the applicable plan. An agency, therefore, has the discretion to approve a plan even though the plan is not consistent with all of a specific plan's policies. It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan." (*Id.* at pp. 1510-1511.)

Appellant has not demonstrated the City abused its discretion here. Even before it was amended, the LTASP permitted setbacks of zero feet along a building's frontage. The PMR's minimal setback from Imperial Highway thus complied with both the original and amended LTASP. Moreover, the original LTASP allowed the zero setback in conjunction with the open space designation and vision for sidewalk expansion, necessarily indicating that these three things can coexist consistently within the LTASP and its objectives. Indeed, the illustrations in the LTASP depict changes to the public right-of-way, not the setback area between buildings and the sidewalk. Appellant has not pointed to any evidence in the nearly 9,000-page administrative record showing that the minimal setback would in any way impede implementation of mobility infrastructure. The primary case she cites, *Elysian Heights Residents Association v. City of Los Angeles* (1986) 182 Cal.App.3d 21, does not advance her claim that the City erred in approving the PMR.

Appellant also ignores statements in the LTASP placing the burden of "road diet, . . . sidewalk improvements, bike improvements, . . . and improved landscaping along the portions of . . . Imperial Highway within the LTASP" primarily upon the City. To the extent developer bears some burden, the SEIR

16

states that the PMR would provide new sidewalks and lighting, concurrently with its broader footprint.

A primary goal of the LTASP is to "establish a land use framework that emphasizes a compact, urban form that relies less heavily on the private automobile." A dense, mixed-use development near public transit, such as the PMR, aligns with and advances this goal. The SEIR recognizes that the project "provides convenient bicycle storage on the first level . . . to encourage residents to use their bicycles while traveling throughout the community and to the train station." Such facilities are expressly suggested in the LTASP as a means by which to achieve the goal of fostering pedestrian and bicycle activities.

In lieu of developing her arguments regarding GHG emissions, appellant cites to her letters below and states that the "summary" of those letters "is that City did nothing to reduce transportation[-]caused GHG emissions." An appellant must fully present all arguments in its briefs rather than incorporate them by reference. (See *Aguimatang v. Cal. State Lottery* (1991) 234 Cal.App.3d 769, 796; cf. *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 [even where appellants permissibly join one another's briefs, "particularized argument," not "cursory and unfocused statements" is required].) We accordingly do not address this issue.

## III.   Mitigation Measure MMT-1

Appellant next contends the City failed to proceed as required under CEQA by effectively exempting the PMR from compliance with MMT-1. The trial court concluded, and respondents now contend, that appellant is precluded from raising this argument because she failed to exhaust it at the

17

administrative level.  Appellant does not address exhaustion in either her opening or reply brief; she asserts only that a putative "concession at trial allows Petitioner to argue now that required implementation of Mobility Infrastructure under MMT-1 applied to the PMR."  We conclude she failed to exhaust her arguments concerning MMT-1.

Section 21177 provides that a CEQA petitioner may not challenge a project "unless the alleged grounds for noncompliance . . . were presented to the public agency orally or in writing by any person during the public comment period provided by this division or before the close of the public hearing on the project before the issuance of the notice of determination."  (§ 21177, subd. (a).)  The purpose of this requirement is to ensure that a public agency has an opportunity to respond to factual issues and legal theories before litigation becomes necessary.  (*Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 453 (*Stop Syar*).)  This purpose is satisfied only where the "exact issue" is presented to the agency below. (*Ibid.*)

"'[T]he requirement of exhaustion is a jurisdictional prerequisite, and not a matter of judicial discretion.'"  (*Stop Syar*, *supra*, 63 Cal.App.5th at p. 453.)  "'Inasmuch as the issue of exhaustion is a question of law, "[a]n appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies."'  [Citation.]"  (*Ibid.*)

None of appellant's letters specifically mentions or refers to the changes the City made to MMT-1, nor do they challenge the City's alleged failure to apply the measure to the PMR.  Appellant also has not pointed to comments regarding this issue made by any other interested party.  The exhaustion requirement

18

accordingly has not been satisfied. Appellant asserts the argument is preserved, however, because "City took the position the MMT-1(e) requirement to implement LTASP Mobility Infrastructure did not apply to the PMR," but during the trial court hearing "reversed their position and agreed MMT-1 applied to private development if a sufficient nexus existed between PMR impacts and the amount of Mobility Infrastructure to be required." This contention is not persuasive.[4] In its response to one of appellant's letters (that did not mention MMT-1), the City stated that the LTASP "identifies various pedestrian and bicycle improvements throughout the specific plan area which will be implemented by the City over time." It also stated that the PMR "cannot incorporate, enhance or connect bicycle networks into the project at this time for a variety of reasons," including lack of existing bicycle networks, a separate City plan that proposes bicycle lanes in locations not proximate to the PMR, and the state's exercise of control over Imperial Highway. Nothing in the cited portion of the hearing transcript is inconsistent with these statements or otherwise tantamount to a reversal of position.

Even if it was, appellant does not cite any authority in support of her suggestion that the exhaustion requirement can be overcome by estoppel. To the contrary, the case appellant cites to support the proposition that mitigation measures cannot be ignored also clarifies the conditions under which mitigation measures can be modified or deleted, as they were here. (See

---

[4] During oral argument, appellant asserted for the first time that the argument was preserved because her letters to the City addressed the mobility requirements of the LTSAP, and those are equivalent to MMT-1. This belated assertion is equally unpersuasive.

19

*Lincoln Place Tenants Association v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1508-1509.)

## IV.    Consideration of Potential Impacts

Appellant contends the City violated its obligations under CEQA by failing to consider in the SEIR the potential environmental impacts caused by the density transfer within the LTASP, the putative waiver of PMR's contribution to mobility infrastructure, and the PMR's GHG emissions.

These overlapping arguments are largely predicated on the assertion that the PMR does not qualify as a transit-oriented development due to its distance from the Metro Green Line station.  From the outset, appellant has taken the position that "development intensification must occur within ½ mile of qualified transit facilities," and "no part of the PMR is located within ½ mile from the Green Line as the crow flies."  Due to this distance, appellant asserts, the PMR will not reduce automobile usage and concomitant GHG emissions.  Additionally, she contends the LTASP amendments permitting smaller units and less open space, coupled with the ability of developers to transfer density across projects within the Town Center District will lead to "an increased concentration of Town Center dwellings at a location without demonstrated alternatives to the automobile," as well as ensure that a future project will need to compensate for PMR's increased GHG emissions.

In its responses to appellant's letters, the City agreed that the PMR was "just outside of the ½-mile radius (within a few feet)," but asserted it qualified as transit-oriented due to its proximity to a bus stop with frequent bus service and was classified as a "High Quality Transit Area" by the Southern California Association of Governments (SCAG).  The City

20

provided hyperlinks to current bus schedules and a SCAG map showing the site's location within a High Quality Transit Area. It also stated that the PMR would "complement" the preexisting Plaza Mexico Shopping Center, through which PMR residents could walk to the Green Line station on a "secure walking path with security guards and lighting along the path." The City asserted that its assumptions and analyses consequently were valid and consistent with CEQA. It further asserted that the PMR was consistent with the intent of the Town Center District to "provide an urban form that can accommodate an urban mixed-use environment that supports public transportation alternatives."

Appellant now contends the City's responses were nothing more than speculation, unsupported by substantial evidence. We disagree. The City provided functional, up-to-date hyperlinks to pertinent bus schedules and maps produced by regional governing bodies. We discern little material difference between providing these links and embedding the full bus schedules and maps within the already lengthy SEIR, particularly where appellant's citation to her "demand" for further data is to the letter she submitted the day of the City Council hearing. Appellant also provides no support for her assertion that "the comparative transit profile between the PMR and the aggregate of the Town Center District differ sharply," or her speculative suggestion that any relevant density transfers would "c[o]me from a donor site with good transit access." As noted above, citations to her previous letters are insufficient to establish an appropriate appellate argument.

With regard to mobility infrastructure, appellant additionally contends that the "approval of the physical

elimination of a nearly 700-foot stretch of an identified Open Space [the Imperial Highway frontage] that required and envisioned a major bicycle and pedestrian corridor without a word of review or explanation will embolden future projects" to rely on the lack of existing bicycle infrastructure to shirk their own contributions. As discussed above, nothing in the LTASP amendments or project plans reduced the permissible setbacks or eliminated any open space. The City also recognized that other applicable planning documents propose bicycle networks on other thoroughfares, and cited evidence from traffic engineers and road designers that creating a one-block bicycle lane on Imperial Highway would be unsafe. Moreover, appellant's contention that not requiring the PMR to create a one-block bicycle lane on a state-controlled road "will likely change the efficacy of the LTASP to achieve its goals" is speculative and unsupported by evidence.

Appellant further asserts that the City's failure to require the PMR to contribute to mobility infrastructure conceals the true extent of the project's GHG emissions. She contends the PMR is distinct from the remainder of the LTASP area for analytical purposes (in part due to its distance from the Green Line), such that the City did not act in good faith in analyzing the project as a cumulative addition to the LTASP.

The SEIR contains a 25-page discussion and analysis of GHGs. The analysis separately examines the impacts of the LTASP amendments and the PMR, and recognizes that both contribute to global climate change impacts. It also recognizes that the unchallenged 2016 EIR concluded the LTASP would not conflict with plans aimed at reducing GHG emissions, that the amendments to the LTASP do not affect this finding, and that the PMR's emissions, while significant, are "in line with SCAG's

22

vision for the southern California region." Appellant has not adequately explained why this does not constitute a "reasonable effort to put into a meaningful context the conclusion that the air quality impacts will be significant." (*Sierra Club*, *supra*, 6 Cal.5th at p. 522.) Her assertion that the City's analysis was not in good faith is thus not well taken. The ultimate inquiry is whether the SEIR includes sufficient detail "'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'" (*Sierra Club*, *supra*, 6 Cal.5th at p. 516.) That standard is satisfied here.

## V.     Conflicts, Consistency, and Appendix G

Appellant argues that the SEIR failed to properly consider the "Appendix G thresholds of significance" for GHG emissions. Appendix G is part of the CEQA Guidelines. It contains a sample "Environmental Checklist Form" that is "intended to encourage thoughtful assessment of impacts, and do[es] not necessarily represent thresholds of significance." (Guidelines Appendix G.) The two sample questions relating to GHG emissions are: "Would the project: a) Generate greenhouse gas emissions, either directly or indirectly, that may have a significant impact on the environment? b) Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases?" (Guidelines Appendix G.) The City included both questions verbatim in the SEIR. Appellant contends the City therefore "selected a 'conflicts' analysis between the PMR and the applicable plans, policies and regulations as its thresholds of significance for GHG emissions," yet ignored its own policies to reduce GHG emissions by focusing exclusively on state and regional policies. She asserts Appendix G does not "excuse"

23

consideration of local plans and policies, and the City failed to meet the CEQA standard of transparency by "limit[ing] its consideration to a uselessly over-broad statement" that the PMR would not conflict with SCAG's plan.

Appellant also challenges the adequacy of the City's "conflicts" analysis generally. She contends there is a distinction between determining whether a project "conflicts" with policies and plans, and determining whether a project is "consistent" with them.[5] She concedes she "could not find a case that discussed the exact legal effect of City's failure to perform the Appendix G 'conflicts' analyses," but asserts an argument rejected in *Stop Syar*, *supra*, 63 Cal.App.5th 444 "parallels Appellant's substantive argument and procedural CEQA contentions in this case."[6]

In *Stop Syar*, a petitioner argued that an EIR failed to address a project's alleged inconsistencies with the county's general plan. (*Stop Syar*, *supra*, 63 Cal.App.5th at p. 460.) The county responded that it concluded the project was consistent with the general plan, and that no further analysis was required under CEQA. It further asserted that the petitioner should have pursued this argument by bringing an ordinary writ of

---

[5] She nevertheless acknowledges in a footnote that Guidelines Appendix G, which uses the word "conflict" in connection with GHG emissions, "is functionally the same as Guidelines § 15125(d)," which provides that an EIR "shall discuss any *inconsistencies* between the proposed project and applicable general plans, specific plans and regional plans." (Guidelines § 15125, subd. (d), emphasis added.)

[6] Appellant cites *Stop Syar* for the first time in her reply brief, despite its publication nearly two months before she filed her opening brief.

mandamus, not a CEQA action. (*Ibid.*) The trial court agreed and declined to address the merits of the argument. (See *ibid.*) On appeal, the petitioner contended it was not required to challenge the county's determination that the project at issue was "consistent" with its general plan, because "'consistency' and 'inconsistency' for purposes of CEQA mean something different than in the context of general planning and land use law." (*Id.* at p. 462.) It tried to characterize its argument as one that the EIR failed to adequately inform the public about inconsistencies and therefore violated CEQA. (See *id.*) The court of appeal rejected this argument, noting that the petitioner "cite[d] no authority supporting its assertion that 'inconsistency' for CEQA purposes is different than for purposes of general planning and land use law," and that another court had rejected attempts to reframe an attack on a deferential determination as an "informational" issue subject to de novo review under CEQA. (*Id.* at pp. 462-463, citing *Golden Door Properties, LLC v. County of San Diego* (2021) 50 Cal.App.5th 467, 482.)

We discern no meaningful distinction between the arguments rejected in *Stop Syar* and appellant's arguments here. Appellant asserts "the difference here is that Appellant relies on City's failure to properly analyze 'conflicts' based on the City's freely chosen threshold of significance stated in Appendix G." As expressly stated in Guidelines Appendix G, the sample questions contained therein "do not necessarily represent thresholds of significance." Consistent with this guidance, the SEIR considered the project and the LTASP amendments in the context of limits set by SCAG and other regional governing bodies. It also separately considered whether the project and the LTASP amendments were consistent with local land use policies.

Appellant does not identify any specific local policies governing or limiting GHG emissions.  Instead, she reiterates her previous contention that City "concealed" GHG emissions by failing to require the project to comply with MMT-1 or implement mobility infrastructure.  Those arguments are no more persuasive under this guise.  The SEIR adequately serves its purpose as an informational document.

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


CURREY, ACTING, P.J.


STONE, J. *

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.